FILED
2024 Jan-22  PM 03:12
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

SANDRA SHEPPARD,                    )
                                    )
        Plaintiff,                  )
                                    )
v.                                  )        Case No. 7:21-cv-1618-GMB
                                    )
MERCEDES-BENZ U.S.                  )
INTERNATIONAL, INC.,                )
                                    )
        Defendant.                  )

## MEMORANDUM OPINION

Plaintiff Sandra Sheppard filed a complaint against her former employer, Mercedes-Benz U.S. International, Inc., alleging discrimination in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 623(a), Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2(m), and 42 U.S.C. § 1981, and retaliation in violation of Title VII and § 1981. Doc. 1 at 8–13.  The parties have consented to the jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Doc. 14.  Before the court is Mercedes-Benz's Motion for Summary Judgment. Doc. 30.  The motion is fully briefed (Docs. 32, 37, 38) and ripe for decision.  For the following reasons, the motion is due to be granted.

## I. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a).  "The purpose of summary judgment is to separate real, genuine issues from those which are formal or pretended." *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute of material fact is genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  In responding to a properly supported motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Indeed, the nonmovant must "go beyond the pleadings" and submit admissible evidence demonstrating "specific facts showing that there is a genuine [dispute] for trial." *Celotex*, 477 U.S. at 324 (internal quotation marks omitted).  If the evidence is "merely colorable, or is not significantly probative, summary judgment may be

granted." *Anderson*, 477 U.S. at 249 (citations omitted).

When a district court considers a motion for summary judgment, it "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party, and must resolve all reasonable doubts about the facts in favor of the nonmovant." *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1274 (11th Cir. 2008) (citation and internal quotation marks omitted).  The court's role is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment." *Allen v. Bd. of Pub. Ed. for Bibb County*, 495 F.3d 1306, 1315 (11th Cir. 2007) (citation omitted).  On the other hand, if the nonmovant "fails to adduce evidence which would be sufficient . . . to support a jury finding for [the nonmovant], summary judgment may be granted." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1370 (11th Cir. 1997) (citation omitted).

## II.  FACTUAL BACKGROUND

Sheppard, a black woman, began working for Mercedes-Benz in November 2004 on the production team in the body shop. Doc. 33-1 at 4, 9.  Mercedes-Benz promoted Sheppard to a team leader position in the body shop in July 2012.

Doc. 33-1 at 9.  In October 2014, Dwight Moore, a white man, offered Sheppard a promotion to a group leader position in global service parts. Doc. 33-1 at 9–10. Sheppard accepted the position, and Moore became her supervisor. Doc. 33-1 at 10. John Reagan, a white man, was their senior manager. Doc. 33-3 at 10.

The other group leaders working under Moore were Ahmad Mitchell, a black man, Corey Miles, a black man, Darren Ray, a white man, and Myrna Rodriguez, a Hispanic woman. Doc. 33-3 at 17; Doc. 33-5 at 2.  Despite the opportunity to move to a specialist position, Sheppard remained a group leader in global service parts until her termination. Doc. 33-1 at 10, 12.  She typically worked the night shift. Doc. 33-1 at 11.  Sheppard testified that Moore "showed bias a lot, unfairness a lot" and that "[i]t seemed to be racially motivated a lot of the time." Doc. 33-1 at 40.

Moore conducted Sheppard's annual evaluations and rated her at 110% for her overall performance in 2015, 110% in 2016 through 2019, and 115% in 2020. Doc. 33-2 at 2–3, 6–17.  Moore's evaluations included notations that Sheppard was a rising talent and that he planned to spend time with her to help her to reach her advancement goals. Doc. 33-2 at 6–8.  He also noted Sheppard's need to develop her leadership skills with new challenges and cautioned her to "avoid headaches unnecessarily." Doc. 33-2 at 6, 8, 14.  Based on these evaluations, Mercedes-Benz selected Sheppard to participate in a leadership program for potential management positions; she attended the program in Portland, Oregon in November 2019.

4

Doc. 33-1 at 21, 60–61.

Despite his positive written evaluations, Moore counseled Sheppard to change her tone in her interactions with other employees and to work on her "people skills."[1] Doc. 33-1 at 18, 64.   This was because Moore had received complaints about Sheppard from other employees, some of whom accused Sheppard of "barking out orders." Doc. 33-1 at 64; *see* Doc. 33-3 at 51–52.   Sheppard testified that she and Moore "would talk . . . about what he had heard or what someone had said.   And then he would say, okay, well, could you work on it or change it.   And then I would ask him follow-up, what did I need to do because it's perception, what people perceive." Doc. 33-1 at 18.   Moore emphasized the Sheppard should work on her tone in speaking. Doc. 33-1 at 18.

Rather than disciplining Sheppard for these interactions or documenting the incidents in her written evaluations, Moore tried to coach Sheppard to be a better leader of the employees working under her. Doc. 33-3 at 25–26.   In 2015, however, Moore issued Sheppard a Note to File for inappropriate behavior when she had an outburst at a subordinate and kicked a box. Doc. 33-1 at 15–16; Doc. 33-2 at 4–5; Doc. 33-3 at 27.   Sheppard disagreed with the note and wrote an objection, but she did not appeal it. Doc. 33-1 at 15–16; Doc. 33-2 at 4–5.

---

[1] Sheppard had similar conversations with Reagan, who suggested that she change her tone of speaking in the workplace. Doc. 33-1 at 13.

In May 2020, an incident occurred between two black female Mercedes-Benz employees, Arkeisha Nevins and Victoria Hamlet. Doc. 33-1 at 22–24.  Sheppard intervened during the incident and sent Nevins home for the day. Doc. 33-1 at 23. Afterwards, Nevins left Moore a voicemail during which she was crying and upset about the way Sheppard treated her. Doc. 33-3 at 30.  Moore discussed the situation with Sheppard to hear her side of the story and eventually decided to contact the Human Resources ("HR") department. Doc. 33-1 at 24; Doc. 33-3 at 16.  He made that decision for a few reasons.  First, it was a busy time at Mercedes-Benz because the global service parts division was transitioning from four warehouses to one facility and dealing with the complications of the COVID-19 pandemic. Doc. 33-3 at 16, 32.  At the same time, Moore "was super busy at a different location and these things came up and [he] wanted to get them resolved, and [he] wanted [them] to come out better leaders." Doc. 33-3 at 32.  Also Moore testified that he was "not responsible for investigating complaints—that is HR's job." Doc. 33-3 at 10.  Moore therefore contacted HR about both the Nevins incident and the other complaints about Sheppard from her coworkers. Doc. 33-3 at 10, 16, 31–32.

Moore spoke with the team relations manager in HR, Hugh Shadeed, a black man. Doc. 33-3 at 10.  Shadeed, who reported to HR senior manager David Olive, a white man (Doc. 33-5; Doc. 33-6 at 4), referred Moore's concerns to employee relations specialist Clevette Ellis, a black woman, for an investigation. Doc. 33-7 at

15, 18–20.  During her investigation, Ellis interviewed Sheppard and obtained a written statement from her. Doc. 33-7 at 24.  She also took statements from Nevins, Hamlett, witnesses to the altercation between Nevins and Hamlett, and other team members who wanted to provide information about Sheppard, including Aaron Crawford, Shandreka Quarles, Jalicia Nixon, and Denisha Washington. Doc. 33-1 at 24; Doc. 33-7 at 20.

After her investigation, Ellis gave Shadeed the information she gathered and recommended that Mercedes-Benz remove Sheppard from her position as a group leader. Doc. 33-7 at 25; Doc. 33-8 at 2–3.  Ellis mentioned that Sheppard's personnel file and reviews did not reflect the "many complaints brought to the attention of her manager and HR" and offered the opinion that "she still brings some talents to the table [but] [h]er leadership to manage [other employees] has been less than desirable." Doc. 33-8 at 2–3.  Ellis concluded that Sheppard had violated the Mercedes-Benz "anti-harassment and Code of Conduct policy." Doc. 33-8 at 3. Although Ellis had recommended a demotion, she met with Shadeed and Moore, and together they instead decided to develop a plan to help Sheppard to grow as a supervisor and improve her leadership at the warehouse. Doc. 33-3 at 39; Doc. 33-7 at 22.

In that vein, Moore and Ellis held a meeting with Sheppard on July 20, 2020. Doc. 33-1 at 27.  Ellis told Sheppard that her investigation revealed she acted

inappropriately by threatening team members and terminating a team member without HR approval.[2] Doc. 33-1 at 27–28; Doc. 33-3 at 45; Doc. 33-7 at 19–21. Ellis presented a Performance Development Plan to Sheppard outlining the results of the investigation, including the conclusion that she was "not performing [her] duties in a way that promotes a Positive Team Culture and do[es] not align with [Mercedes-Benz]'s Integrity Code." Doc. 33-2 at 19. The document also stated that Sheppard "created an unpleasant work environment for [her] team members" and her "communication with [her] team members ha[d] been ineffective." Doc. 33-2 at 19. The document outlined expectations for Sheppard going forward, including that she would (1) communicate in a positive manner with coworkers, (2) control her reactions to conflict and resolve issues and concerns in a professional manner, (3) treat other employees with respect at all times, and (4) complete certain training programs outlined in the Performance Development Plan. Doc. 33-2 at 19.

The attached plan recommended the following training and steps to improve Sheppard's leadership: (1) a "360 Assessment" requesting her direct reports to assess her baseline leadership skills; (2) in-person and online training sessions; and (3) one-on-one coaching, ideally with her manager. Doc. 33-2 at 20. The stated purpose of the plan was to improve Sheppard's leadership skills and not to be a punishment. Doc. 33-3 at 37, 45. Mercedes-Benz would pay for the training, allow Sheppard

---

[2] Sheppard denies that she threatened or terminated any team members. Doc. 33-1 at 28.

8

time to complete it, and pay her for the time she spent on the training. Doc. 33-1 at 29.  Sheppard did not object to the additional training but was upset that she had been accused of acting inappropriately. Doc. 33-1 at 30.  She told Moore and Ellis that she did not agree with the conclusions of the investigation and did not believe that she needed the Performance Development Plan. Doc. 33-1 at 29–30.  Sheppard said she wanted to appeal the findings of the investigation. Doc. 33-1 at 29.

Sheppard, Shadeed, Ellis, and Moore met on Thursday, July 23, 2020, to talk about the outcome of the investigation, the performance plan, the July 20 meeting, and Sheppard's disagreement with the results of the investigation. Doc. 33-1 at 30.  Sheppard said that she did not accept the results, refused the performance plan, and asked to speak to Shadeed alone. Doc. 33-1 at 30–31.  While talking with Shadeed, Sheppard complained about the investigation and argued that Ellis should have interviewed other employees. Doc. 33-1 at 30–31.  Sheppard admits she was upset during her meeting with Shadeed. Doc. 3-1 at 31.  Among other things, she told him that "black females in service and parts warehouse, no matter how talented or experienced, always get terminated" and that Moore "was a racist and he was just being discriminatory [and] . . . he was showing discrimination by constantly trying to discipline [her] for things that [she] had not done." Doc. 33-1 at 31, 60.  Shadeed did not tell Olive, Moore, or Ellis about this complaint of discrimination, and Sheppard did not complain directly to any of them. Doc. 33-3 at 14; Doc. 33-6 at

24–25, 38; Doc. 33-7 at 25.

Shortly after the meeting, Shadeed decided that Sheppard should not be a leader on the shop floor and recommended suspending her. Doc. 33-3 at 45. Sheppard was called to a conference room where Shadeed, Ellis, Moore, and Reagan were waiting for her. Doc. 33-1 at 31.  Ellis told her that she was suspended, escorted her to her desk to retrieve anything she needed, and then led her out of the facility. Doc. 33-1 at 31–32.  They did not tell her why she had been suspended. Doc. 33-1 at 32.  The next day, Friday, July 24, Shadeed called Sheppard and told her to report to another meeting on Monday, July 27. Doc. 33-1 at 32.

On Monday, Sheppard arrived at the meeting with Shadeed, Ellis, and Moore. Doc. 33-1 at 33.  Moore began the meeting by explaining to Sheppard that Mercedes-Benz wanted her to participate in the performance plan to become a better leader. Doc. 33-1 at 44.  They asked her if she thought about the plan over the weekend and was now willing to agree to it. Doc. 33-1 at 34.  Sheppard "started reiterating no, because that was a false accusation and [she] wasn't just going to sign and agree that [she] had done something that [she] did not do, that the investigation wasn't a fair investigation and [she] was going to appeal." Doc. 33-1 at 34.  At that point, they told Sheppard that the decision to place her on a performance plan could not be appealed. Doc. 33-1 at 34.

Sheppard admits she was upset during this meeting. Doc. 33-1 at 35.

Although Sheppard denies that she was disrespectful or angry (Doc. 33-1 at 35, 45), Moore perceived her as agitated and angry, remembers that she interrupted him and Ellis during the meeting, and said that she was disrespectful to Ellis. Doc. 33-3 at 39–41.  Moore explained that Sheppard's "body actions, her tone of voice, and her back and forth when [they] were trying to talk to her" made him believe she was angry during the meeting. Doc. 33-3 at 41.

Moore, Ellis, and Shadeed asked Sheppard to sign the performance plan. Doc. 33-1 at 34.  Sheppard initially refused, but eventually agreed to sign the plan while maintaining that she was signing it "under duress" and insisting that she have the opportunity to write written objections on the document. Doc. 33-1 at 34. Although she had not been threatened with termination for not signing the document, Sheppard said that she would sign the performance plan only to avoid losing her job. Doc. 33-3 at 37–38.  While Sheppard wrote down her objections, Shadeed and Moore stepped outside of the conference room. Doc. 33-1 at 34.  When they returned, Shadeed asked Sheppard if she was recording the meeting, and she admitted that she was. Doc. 33-1 at 34.  Shadeed asked her to stop the recording. Doc. 33-1 at 34.

When Sheppard finished writing her objections, Moore told her that it was time to get back to work. Doc. 33-1 at 35; Doc. 33-3 at 43.  According to Moore, Sheppard responded by abruptly getting up, exiting the room, and slamming the door

"hard enough that there was something on the wall above [Ellis] that moved around."
Doc. 33-3 at 43.  Similarly, Ellis testified that Sheppard "angrily got up and shut the
door . . . she slammed it so hard that I did jump up because I thought the picture over
me was going to hit me in my head." Doc. 33-7 at 27.  Even though she was upset,
Sheppard denies she slammed the door: "I closed it.  I don't know how gently or not,
but I closed it." Doc. 33-1 at 35.

Sheppard returned to the warehouse but was called to another conference
room, where she met with Shadeed and Ellis. Doc. 33-1 at 36–37.  Shadeed told her
she was suspended again until further notice. Doc. 33-1 at 37.  Ellis again walked
Sheppard out of the facility. Doc. 33-1 at 37.  After she left, Shadeed, Ellis, and
Moore provided written statements to Olive about the most recent meeting with
Sheppard. Doc. 33-6 at 35–36, 43, 46.  Olive also met with Shadeed and Ellis
individually a few days later. Doc. 33-6 at 36–37.  Olive did not interview or get a
statement from Sheppard but knew she had complained about Ellis' investigation
and the decision not to interview her entire staff. Doc. 33-6 at 37–38.  Olive did not
listen to Sheppard's audio recording of the meeting. Doc. 33-6 at 45.

Based on the three statements and his conversations, Olive decided to
terminate Sheppard's employment. Doc. 33-6 at 37.  He believed he had three
credible statements and had no reason to question their accuracy. Doc. 33-6 at 46.
Specifically, from the information given to him, Olive concluded that Sheppard

violated Mercedes-Benz's Integrity Code and positive team culture through her conduct and tone with her peers and with her managers during the July 27 meeting, her refusal to accept the performance plan, her recording of the meeting without the others' knowledge,[3] and her slamming of the door hard enough to shake the wall when she left the meeting. Doc. 33-6 at 42–43, 49.  Olive testified that he believed this conduct did not align with the behavior expected from individuals in leadership positions at Mercedes-Benz. Doc. 33-6 at 43, 49.

Based on Olive's decision, Shadeed called Sheppard and told her that her employment with Mercedes-Benz was terminated effective as of July 30, 2020. Doc. 30-1 at 37.  Shadeed sent a letter on August 3 confirming Sheppard's termination and notifying her that the decision was based on her actions "inconsistent with [Mercedes-Benz]'s expectations of a person in a leadership role and in violation of [Mercedes-Benz]'s Integrity Code." Doc. 30-2 at 24.  Tim Crawford, a black man, replaced Sheppard. Doc. 33-3 at 47.

## III. DISCUSSION

Sheppard's complaint alleges the following claims: (1) age discrimination in her termination in violation of the ADEA (Count I), (2) race discrimination in her termination in violation of Title VII and § 1981 (Counts II and VI), (3) gender

---

[3] Mercedes-Benz does not have a policy prohibiting employees from recording meetings. Doc. 33-6 at 43–44.

discrimination in her termination in violation of Title VII (Count IV), and

(4) retaliation in violation of Title VII and § 1981 (Counts III and IV). Doc. 1 at 8–

13.  Mercedes-Benz moves for summary judgment on all claims. Doc. 30.

In response to the motion for summary judgment, Sheppard did not address

Mercedes-Benz's arguments about her age discrimination claim. *See* Doc. 37.  The

court therefore deems this claim to have been abandoned. *See Adams v. Bank of Am.,*

*N.A.*, 237 F. Supp. 3d 1189, 1203 (N.D. Ala. 2017) ("A party that fails to defend a

summary judgment claim that is targeted by a summary judgment motion is deemed

to have abandoned that claim.") (citing *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314,

1322 (11th Cir. 2001) (collecting cases)).

Mercedes-Benz also claims that Sheppard abandoned her gender

discrimination claim. Doc. 38 at 5.  In briefing, Sheppard repeatedly contends that

suffered discrimination based on her status as a black woman. *See* Doc. 37 at 10, 11,

17, 24 & 26.  She also states that she is "a member of a protected class (black and

female)." Doc. 37 at 21.  Her complaint, however, does not allege that she belongs

to a distinct protected subclass of "black females," and she does not rely on the

Eleventh Circuit caselaw addressing claims for intersectional discrimination.

*See Harrington v. Cleburne County Bd. of Educ.*, 251 F.3d 935, 937 (11th Cir. 2001)

(defining "intersectional discrimination" as a situation where "the defendant treated

[the plaintiff] disparately because she belongs simultaneously to two or more

14

protected classes"); *Mosley v. Ala. Unified Jud. Sys., Admin. Off.*, 562 F. App'x 862, 866 (11th Cir. 2014) (citing *Jefferies v. Harris County Action Assoc.*, 615 F.2d 1025, 1032–35 (5th Cir. 1980) ("This Court has recognized black females as a distinct protected subgroup under Title VII.").  Because Sheppard has not alleged that her protected group is the subclass of black females, and "[a] party may not amend [her] complaint through argument in a brief opposing summary judgment," *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004), the court analyzes her claims as pled—separate claims for race and gender discrimination. Nevertheless, Sheppard's references to gender in her arguments are sufficient to overcome Mercedes Benz's argument that she abandoned her claim for gender discrimination.

## A.     Race and Gender Discrimination

Title VII prohibits an employer from discriminating against any employee with respect to compensation, terms, conditions, or privileges of employment "because of" race or gender. 42 U.S.C. § 2000e-2(a)(1).  Section 1981 prohibits "intentional race discrimination in the making and enforcement of public and private contracts, including employment contracts." *Ferrill v. Parker Group, Inc.*, 168 F.3d 468, 472 (11th Cir. 1999); 42 U.S.C. § 1981.  The elements of race discrimination claims under Title VII and § 1981 are the same and therefore need not be analyzed separately. *See Rice-Lamar v. City of Fort Lauderdale*, 232 F.3d 836, 843 n.11 (11th

Cir. 2000).

Sheppard contends that Mercedes-Benz discriminated against her because of her race and gender when it terminated her employment. Doc. 1 at 9, 12–13. Generally, where a plaintiff bases a claim of race or gender discrimination on circumstantial evidence, the court applies the framework established in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). *See, e.g.*, *McCann v. Tillman*, 526 F.3d 1370, 1373 (11th Cir. 2008). "To prevail on a claim for discrimination under Title VII based on circumstantial evidence, [a plaintiff] must show that: (1) [s]he is a member of a protected class; (2) [s]he was qualified for the position; (3) [s]he suffered an adverse employment action; and (4) [s]he was replaced by a person outside h[er] protected class or was treated less favorably than a similarly-situated individual outside h[er] protected class." *Maynard v. Bd. of Regents of Div. of Univ. of Fla. Dep't of Educ. ex rel. Univ. of S. Fla.*, 342 F.3d 1281, 1289 (11th Cir. 2003) (citing the elements for a *prima facie* case as set forth in *McDonnell Douglas Corp*., 411 U.S. at 802). "[O]nce a plaintiff establishes a *prima facie* case of race [or gender] discrimination through indirect proof, the defendant bears the burden of producing a [gender-neutral or] race-neutral explanation for its action, after which the plaintiff may challenge that explanation as pretextual." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020).

To avoid summary judgment, an employee must establish a genuine dispute

of material fact that the employer's reason is pretextual. *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 921 (11th Cir. 1993).  To do that, an employee must cast enough doubt on the veracity of the reason so that a reasonable factfinder could find it "unworthy of credence." *Gogel v. Kia Motors Manuf. of Ga., Inc*., 967 F.3d 1121, 1136 (11th Cir. 2020) (en banc) (citation and internal quotation marks omitted).  "If the employer's stated reason is legitimate—in other words, if it might motivate a reasonable employer to act—then the employee must address 'that reason head on and rebut it.'" *Berry v. Crestwood Healthcare LP*, __F.4th__, 2023 WL 7095309, at *4 (11th Cir. Oct. 27, 2023) (quoting *Patterson v. Ga. Pac., LLC*, 38 F.4th 1336, 1352 (11th Cir. 2022) (citation and internal quotation marks omitted)).  "An employee cannot rebut a reason "'by simply quarreling with the wisdom of'" it. *Id*. (citation and internal quotation marks omitted).  Instead, she must point to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the justification. *Id*. (citation omitted).

"Given that the *prima facie* case operates as a flexible evidentiary standard . . . it should not be transposed into a rigid pleading standard for discrimination cases." *Swierkiewicz v. Sorema N.A*., 534 U.S. 506, 512 (2002).  Instead, it is only a method that aids an employee in establishing discrimination with circumstantial evidence.  Without relying on the *McDonnell Douglas* framework, an employee may prove discrimination with any circumstantial evidence that creates a reasonable

inference of discriminatory intent. *See Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).

Circumstantial evidence of discriminatory intent includes, but is not limited to, "(1) suspicious timing, ambiguous statements, and other bits and pieces from which an inference of discriminatory intent might be drawn, (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Lewis v. City of Union City, Ga.*, 934 F.3d 1169, 1185 (11th Cir. 2019) (quotation marks and citations omitted). "The critical decision that must be made is whether the plaintiff has 'create[d] a triable issue concerning the employer's discriminatory intent.'" *Flowers v. Troup County, Ga., Sch. Dist.*, 803 F.3d 1327, 1336 (11th Cir. 2015) (quoting *Smith*, 644 F.3d at 1328). In other words, "[t]o survive summary judgment, the employee must present a story, supported by evidence, that would allow a reasonable jury to find that the employer engaged in unlawful [discrimination] against the employee." *Berry*, 2023 WL 7095309, at *7 (citing *Lewis*, 934 F.3d at 1185).

Sheppard's briefing does not clearly identify the theory under which she travels in proving her claims of intentional race and gender discrimination. On the one hand, she discusses her evidence through the lens of the *McDonnell Douglas* framework. On the other, she appears to argue that she does not have to proceed under that framework to establish discrimination. She is correct, of course, that

*McDonnell Douglas* is not the only way to prove her claim, but her arguments blur the two lines of cases. *See* Doc. 37 at 21–31.  Regardless, because "an employee may present circumstantial evidence—in any form—that creates a reasonable inference of [discrimination]," *Berry*, 2023 WL 7095309, at *7, the court will look to the totality of Sheppard's circumstantial evidence in determining whether she created a "'a triable issue concerning the employer's discriminatory intent.'" *Flowers*, 803 F.3d at 1336 (quoting *Smith*, 644 F.3d at 1328).

Sheppard points to the following circumstantial evidence to prove intentional race and gender discrimination: (1) Olive's stated reasons for her termination are not credible; (2) "Moore—motivated by discriminatory animus—deceived the official decisionmaker in HR, Olive, to terminate" Sheppard; (3) Moore systematically favored employees who were not black women; (4) the suspicious timing of Sheppard's lack of progress after Moore became her supervisor; and (5) Myrna Rodriguez behaved similarly but was not terminated. Doc. 37 at 23–31.

Viewing this evidence in the light most favorable to Sheppard, she has not established that race or gender was the real reason for her termination.  Indeed, the evidence here is a far cry from the type of circumstantial evidence of discriminatory intent sufficient to present a triable issue.  For example, in *Smith*, 644 F.3d at 1344–46, the evidence included a backdrop of racial tension following a workplace shooting by an employee who was a white supremacist, evidence the disciplinary

review committee  utilized a spreadsheet indicating an employee's race and gender during its disciplinary investigation, evidence of the distribution of racially insensitive and offensive e-mails, and tension generated by an upcoming news program criticizing the employer's struggles with racial intolerance.

Here, the evidence does not come close to painting a picture of race or gender discrimination.  Other than her self-serving allegations, Sheppard has not presented anything to show that any of the actions taken by the other Mercedes-Benz employees had anything to do with her race or gender.  It is undisputed that Olive made the termination decision.  But Sheppard focuses most of her argument on Moore and contends that he manipulated Olive into terminating her because he is biased against black women.  While this argument might align with Sheppard's personal opinions, it is not supported by the record. *See Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir. 1997) ("While Holifield has testified that he felt discriminated against, his opinion, without more, is not enough to establish a prima facie case of race discrimination."), *abrogated on other grounds by Lewis v. City of Union City, Ga.*, 918 F.3d 1213 (11th Cir. 2019).   Instead, the record shows that Moore and Sheppard had an amicable working relationship and that Moore promoted Sheppard and gave her positive performance reviews.  There is no evidence that Moore recommended her termination, only that he agreed with the decision to issue Sheppard the performance plan to help her to improve her leadership skills. Doc. 33-

3 at 39.  Sheppard's generalized allegations of Moore's animus toward women or black women (*see, e.g.*, Doc. 33-1 at 59–60; Doc. 37-1) amount to nothing more than speculation.

Moreover, there is no evidence that Moore did anything to manipulate Olive's decision to terminate Sheppard's employment.  The undisputed evidence establishes that Olive received three reports of Sheppard's behavior during the July 27 meeting—one from Shadeed, one from Ellis, and one from Moore.  Based on the three similar reports, which Olive believed to be credible, Olive made the decision to terminate Sheppard because her conduct in the meeting did not align with the behavior expected from employees in leadership positions. Doc. 33-6 at 43, 49. There is no evidence that Olive gave Moore's report more emphasis or that Moore otherwise took any actions to influence his decision.  In fact, Olive spoke with Ellis and Shadeed about the incident, but not Moore. Doc. 33-6 at 36–37.

Additionally, Sheppard's efforts to contrast Moore's treatment of her with his treatment of Rodriguez are not persuasive. Doc. 37 at 25 & 26.  Specifically, Sheppard contends that Rodriguez received similar complaints from her subordinates but "was never investigated or put on a performance development plan," and "Moore recommended her for promotion and assisted her in passing the test." Doc. 37 at 25.  Based on these facts, Sheppard concludes that her "lack of progress once Moore became her supervisor, coupled with the systematically

preferential treatment of employees who are not black women, creates a convincing mosaic of discrimination." Doc. 37 at 24.

The court first points out the obvious: Rodriguez is a woman, so any comparison with her relates only to Sheppard's race discrimination claim and not to her gender discrimination claim. But even taking Sheppard's allegations as true— that despite instances of bad behavior by Rodriguez, Moore helped her advance when he did not help Sheppard—Sheppard's conclusions from these facts are too speculative to amount to evidence of race discrimination. The Eleventh Circuit has "never suggested that a plaintiff's generalized averment that her employer treated her differently than employees of a different race can, alone, create a 'convincing mosaic of circumstantial evidence' from which a jury could find intentional discrimination based on race." *Turner v. Fla. Prepaid Coll. Bd.*, 522 F. App'x 829, 833 (11th Cir. 2013) (citation omitted). Indeed, "'Title VII is neither a general civility code nor a statute making actionable the ordinary tribulations of the working place.' Unless something links the actions to the employee's race, that a decisionmaker singles an employee out does not permit a jury to infer intentional discrimination based on race." *Id.* (citation omitted).

Finally, there is no other circumstantial evidence indicating that race or gender was a deciding factor in Sheppard's termination. Sheppard's opposition brief sets out her disagreements with the stated reason for her termination. None of her

arguments, however, result in "a story, supported by evidence, that would allow a reasonable jury to find that the employer engaged in unlawful [discrimination] against the employee." *Berry*, 2023 WL 7095309, at \*7 (citing *Lewis*, 934 F.3d at 1185). Instead, at best, Sheppard has presented evidence that Mercedes-Benz was either mistaken about what occurred or did not have a good reason to terminate her employment. But "employers are free to fire their employees for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Flowers v. Troup County, Ga., Sch. Dist.*, 803 F.3d 1327, 1338 (11th Cir. 2015) (citation and internal quotation marks omitted).

In short, "[t]he role of th[e] [c]ourt is to prevent unlawful [employment] practices, not to act as a super personnel department that second-guesses employers' business judgments. Our sole concern is whether unlawful discriminatory [or retaliatory] animus motivates a challenged employment decision." *Gogel v. Kia Motors Mfg. of Ga., Inc*., 967 F.3d 1121, 1148 (11th Cir. 2020) (en banc) (alterations in original) (citation omitted)). Summary judgment is due to be granted on Sheppard's race and gender discrimination claims.

## B.    Retaliation

Title VII protects an employee against retaliation after the employee (a) opposes any practice prohibited by Title VII or (b) participates in any manner in

any investigation, proceeding, or hearing under Title VII. *See* 42 U.S.C. § 2000e-3(a); *EEOC v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1174 (11th Cir. 2000).  While 42 U.S.C. § 1981 does not explicitly protect against retaliation, it has been interpreted as doing so. *See CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 451–52 (2008); *Andrews v. Lakeshore Rehab. Hosp.*, 140 F.3d 1405, 1412–13 (11th Cir. 1998).  The elements of retaliation claims under § 1981 and Title VII claims are the same and therefore need not be analyzed separately. *See Butler v. Ala. Dep't of Transp.*, 536 F.3d 1209, 1212–13 (11th Cir. 2008).

As with discrimination claims, one method of analyzing a retaliation claim based on circumstantial evidence is the *McDonnell-Douglas* burden-shifting framework.[4] *See Goldsmith v. City of Atmore*, 996 F.2d 1155, 1162–63 (11th Cir. 1993).  To establish a *prima facie* case of retaliation under Title VII, Sheppard must show that (1) she engaged in a protected activity, (2) she suffered an adverse employment action, and (3) there was a causal relationship between the two events. *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1363 (11th Cir. 2007).  If she demonstrates a *prima facie* case of retaliation, the burden shifts to Mercedes-Benz to show a non-retaliatory reason for the adverse employment action. *See id*.  If it

---

[4] The court is aware that "[w]ithout relying on the *McDonnell Douglas* framework, an employee may prove retaliation with any circumstantial evidence that creates a reasonable inference of retaliatory intent." *Berry*, 2023 WL 7095309, at *6. Sheppard, however, has elected to travel under the *McDonnell Douglas* framework in her attempt to prove her retaliation claim. *See* Doc. 37 at 15–21.

succeeds, Sheppard must satisfy the "but for" test pronounced in *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338 (2013). *See Tolar v. Bradley Arant Boult Cummings, LLP*, 997 F.3d 1280, 1294 (11th Cir. 2021) (citation omitted). "That is, the plaintiff must show that, based on the evidence, one could reasonably infer that but for her protected conduct the employer would not have taken the alleged adverse action." *Id*.

Sheppard has met the first two elements of her *prima facie* case of retaliation. She testified that she complained to Shadeed about racial and gender discrimination by Moore. Doc. 33-1 at 31, 60 (stating that "black females in service and parts warehouse, no matter how talented or experienced, always get terminated" and that Moore "was a racist and he was just being discriminatory [and] . . . he was showing discrimination by constantly trying to discipline [her] for things that [she] had not done"). While a close call as to gender, Sheppard's testimony is sufficient. And she suffered an adverse employment action when Mercedes-Benz terminated her employment. Mercedes-Benz contends, however, that Sheppard cannot establish the third element of her *prima facie* case. Doc. 32 at 32–33; Doc. 38 at 7–8. The court agrees.

To prove a causal connection at the *prima facie* stage, a plaintiff must show two things. First, she must demonstrate that "the decisionmaker actually knew about the employee's protected expression." *Martin v. Fin. Asset Mgmt. Sys.*, 959 F.3d

1048, 1053 (11th Cir. 2020).  The knowledge "requirement rests upon common sense.  A decision maker cannot have been motivated to retaliate by something unknown to him." *Brungart v. BellSouth Telecomms., Inc*., 231 F.3d 791, 799 (11th Cir. 2000).  Therefore, "unrebutted evidence that the decision maker did not have knowledge that the employee engaged in protected conduct" generally extinguishes any causal connection between the protected activity and the adverse employment action. *Id*.; *see also Bass v. Bd. of County Comm'rs, Orange County, Fla*., 256 F.3d 1095, 1119 (11th Cir. 2001), *overruled in part on other grounds by Crawford v. Carroll*, 529 F.3d 961 (11th Cir. 2008) ("It is not enough for the plaintiff to show that someone in the organization knew of the protected expression; instead, the plaintiff must show that the person taking the adverse action was aware of the protected expression.").  Second, a plaintiff must demonstrate that "the protected activity and the adverse action were not wholly unrelated." *Tolar*, 997 F.3d at 1294 (citation and quotation marks omitted).  This standard is met where there is "close temporal proximity" between the statutorily protected activity and the adverse action; absent other evidence of causation, however, the temporal proximity "must be very close." *Id*. (citation and quotation marks omitted).

Sheppard has not established that Olive, the ultimate decisionmaker, knew about her complaint of discrimination.  Even crediting Sheppard's testimony, she complained to Shadeed only. Doc. 33-1 at 31, 60.  And Olive testified that Shadeed

did not tell him about Sheppard's complaint. Doc. 33-6 at 24–25, 38.  Sheppard does

nothing to rebut this evidence[5] and "unrebutted evidence that the decision maker did

not have knowledge" of the employee's protected conduct means that "temporal

proximity alone is insufficient to create a genuine issue of fact as to causal

connection." *Brungart*, 231 F.3d at 799.  Indeed, a "decision maker cannot have been

motivated to retaliate by something unknown to him." *Id*.

Without evidence that Olive knew of her protected activity, Sheppard's

retaliation claim fails.  Therefore, summary judgment is due to be granted in favor

of Mercedes-Benz on Sheppard's retaliation claim.

## IV.  CONCLUSION

For these reasons, the Motion for Summary Judgment (Doc. 30) is due to be

granted.  A separate final order will be entered.

DONE and ORDERED on January 22, 2024.

_____
GRAY M. BORDEN
UNITED STATES MAGISTRATE JUDGE

---

[5] Eleventh Circuit law allows Sheppard to avoid summary judgment if she can present any other evidence of Olive's knowledge. *See Brungart*, 231 F.3d at 799.  Alternatively, Sheppard could present evidence that impeaches Olives' denial. *See id.*  She has done neither.  Her brief does not address Olive's lack of knowledge and focuses instead on temporal proximity and whether her conduct broke the causal connection. Doc. 37 at 18–21.